The admissible evidence here is sufficient to get to the jury on all three applicable tests for continuing tort as set forth in California Jury Instruction 20-30, which was adopted in 2003 and updated in 2008. The first test in the instruction, abatability, revolves around reasonableness, largely, and reasonableness is typically an issue left to the juries. This is not a Mangini case of no evidence, or in the words of the Mangini Court, a complete absence of any evidence whatsoever on abatability by reasonable means at reasonable cost. Now it's also important to uncouple here the issue of abatement from the issue of damages, and that was noted, actually, in the portion of the Skokomish, the U.S. decision. Let's talk about the court's decision to exclude Mr. Forster, because that really then gutted the heart of the case. It seems to me, if I understand this ruling correctly, that the district court was extremely critical of the decision not to do any investigation into background or original condition of the property. Why wasn't that done? Your Honor, I would like to first address the question of whether that gutted the case. My comments today are primarily directed toward a reversal without any reference, really, to Forster. But you're being asked a question. Pardon me? You're being asked a question. Yes. Go answer it. And I will answer the question. I've got the same question for you, too. And there are — That's your job. Answer our question. Well, the reason — I will do my best, Your Honor. That's fair to disagree with my characterization that it gutted the case. The reason I say that is I'm trying to look at it from the district court's perspective. In looking at his analysis, he thought that that gutted your case. Many of the claims that he granted summary judgment on flowed from the criticism of what he thought the expert didn't do. And he viewed that as a methodological failure. And that was the — that's why he characterized it as gutting the case. But anyway, so agree with that or not, let's talk about the criticisms of the expert's testimony and the reason why the court thought that there was a methodological failure such that exclusion is appropriate. So how do you respond to that? OK. On the restoration part, the alleged methodological failure there, the judge rewrote the statute because the statute in its plain language says restoration to original condition. We task Forrester with doing exactly that, restoring the property to original condition. There was data which Forrester set forth that talked about there being locations on the site, the city property, that were not contaminated. So we did have knowledge about background conditions. There was data on that. And so there was data about the background conditions. And the question of the part of the continuing tort where was there material flowing across the property line, there the district court misunderstood Forrester's opinion. Because the question that Forrester was asked and the question that he answered was actually an irrelevant question. And that's obvious from the actual testimony. And that question was, was there an event after August of 2004 that subsequently hit the city property? That's not the question. Forrester answered the right question, which was, was as of August of 2004, material still flowing across that property line. And there is a lot of evidence of that which I can speak to. And so when you look at the questions that were asked of Forrester, he answers the question. And so I think the judge misunderstood what Forrester was saying and either just accepted Kendra Morgan's mischaracterization of it or otherwise. The third part of it. I thought, let me back up because I want to make sure that I'm not missing anything from the record here. I thought that during his deposition, he indicated that there were, or he deduced that he could discern what the original background condition was. But during his deposition, he indicated that he didn't have any data to back it up. Well, I actually think that the part where he says, I don't have any data to back it up is in response to a question that was asked about, was this property susceptible or not susceptible to contamination from other sources? And he said, I don't have any data to back that up one way or another. And so, but he did say there were places on the property that were not contaminated. So I don't think there's any question about that. And then, so the other part of it is the crossing of the property line when you look at the right questions. Is there any issue that the property was contaminated? There's no issue that the property was contaminated, Your Honor, but the question is, when was it contaminated? When Kinder Morgan acquired the property, they understood that there was a big problem with the water pollution, and they undertook to clean it up. They undertook to abate it, that's correct. And so the question, to go back to finish answering the question you posed, the information in August of 2004 was, and this was where Forrester says he does have data, and there's ample admissions from Kinder Morgan itself, that as of August 2004, material, historically released material on the Mission Valley Terminal continued to cross the property line onto the property of the city. And that makes it a continuing tort. And in that, you can look, I can give the court some citations, but there are numerous Kinder Morgan witnesses, three in number, one of whom is an expert, that admits that it wasn't until 2005 that they first built a containment system at the property line and operated it. And the three witnesses actually say containment was not achieved until 2005, June of 2005 or later. And that's at ER 4071-72, 4067-68, 4124-25, and 4022-24. And the final part of the answer to your question is that I believe that under Half v. Lone Pine, which is the burden shifting rule under California law from the California Supreme Court, that they would have actually had the burden here of proving that their material was not crossing the property line. In 1992, the cleanup and abatement order was issued that put on them, Kinder Morgan, the obligation to stop that material from crossing the property line. They didn't perform that. And so if there's a gap in the data here about material crossing the property line in 2004, it's very much the result of a failure to perform a duty that was placed on them, which takes you right into Half v. Lone Pine and the shifting of the burden of proof. Not all of the opinions are up on appeal before us, so we're just looking at the decision with regard to Opinions 5 through 11. Is that right? Correct. Now, my question to you is this. Let's assume that we agree with the district court that there's some deficiency in the failure to conduct background. It's a very broad ruling that the district court did in this case. Are there certain opinions among 5 through 11 that has very little to do with background? So in other words, not all of his opinions depend on an investigation of background. Would that be a fair statement? That is a fair statement. For example, were things crossing on or after August of 2004? That doesn't have to do with background. That has to do with Kinder Morgan's failure to implement a containment system and put it into effect before June of 2005 or later. So Forrester's opinion on that doesn't really have anything to do with it. His restoration opinion, which is that you would have to implement thermal treatment technology, that doesn't have anything to do with background. That has to do with what steps can be done to restore to original condition. So yes, I do think that it was a very, very broad kind of blunderbuss approach to Forrester's opinions. But I also think that on issues of abatability, the rental damages, things like that, you don't need Forrester's opinion, by and large, to get to a different result than what the judge got to. And that these should have been issues for the jury, not for the district court to decide. You know, there's a huge, huge record here. Now, is there any, I missed it, but is there a diagram which shows both properties, and which shows how this containment has been achieved or will be achieved, and what the process will be to clean up this water? Well, your honor, I read Discover magazine, a lot of them. They give you all, you know, you can take complicated subjects like the brain, and all the research we're doing today in bioscience. And they give you these nice diagrams so you can see it. Do we have anything like that here? Your honor, there are diagrams, there are numerous reports that have diagrams, and there's actually two that are specific diagrams of the footprint of the contamination drawn by Kinder Morgan Consultants in 2004. I've seen those, the footprint. Yes. But I'm just asking you, like this containment, how do they do that? You go down and you dig a trench, and then you fill it with concrete. What do you do? The containment in this case was called a hydraulic barrier. And so what they do is you have an aquifer that is full of water flowing through, and so you drill wells down into the aquifer, and you start sucking the water out. And that creates what's called a cone of influence, where the water starts flowing into the wells. And so that cone of influence, and this is done with computer models and smart people, they drill the wells at the right spot and the right number, and have these cones of influence such that they are pulling in the contaminant so it doesn't... And to that is a barrier to seawater coming in, too. Very similar, exactly. Yes. I handled this Hyperion case. You know about that? I know generally about it, yes. Generally? I'd like to say I was involved in it, but I was not. I am known as the sludge judge. Your Honor, I've never heard that before, but I will remember that from now on. But don't repeat it. Well, I won't refer to him that way. Well, that's all right. I kind of like it. We're all going to end up in sludge anyway one day. That's true. Yeah. So we have big problems like this. Let me ask a question. You started off, it sounded like you really didn't want to talk about this expert. Is that something you think is not really important to us, to your appeal? Because it looked like you almost were not going to even mention it in your arguments. And I want to get back to that. Is it something that you aren't really concerned about or what? Your Honor, I believe that there is sufficient evidence to get to the jury on whether or not it's a continuing nuisance without Forrester. The rental damages don't have anything to do with Forrester. The water damages don't have anything to do with Forrester. The restoration damages have to do with Forrester. And there you have a de novo review because the district court was interpreting and completely misinterpreted the state statute because Forrester was asked there, tell us what would have to be done to restore to original condition. That's the restoration portion of 33-34. And so that's where Forrester matters. And there it's a de novo review. The abuse of discretion parts of the review, I think we have enough evidence to get to the jury on each of these topics without Forrester. But I do think there was an error with Forrester. But I think I can get to the jury without that. For example, on continuing tort, Kinder Morgan admits and they've told this court 10 times in their brief, we are abating. That's textbook. Is this a continuing tort if it's abatable? The order pursuant to which they are abating says they are abating at a reason, that they only have to abate to an economically feasible and technically feasible way. It's just like, Judge Pregerson, what you wrote about or what you concurred in the Skokomish part of the decision where the FERC order there was talking about, well, it was reasonable and that that was enough really to get to the jury. Kinder Morgan has told the world, we have abated soil. And again, in the Skokomish part of the decision, Judge Pregerson, which you concurred, the discussion is- Give me a cite to my opinion, will you? Pardon me? I did- Give me a cite to my opinion. I know it's page 521 and I'll give you a specific cite. It is 410 F3rd 506, 9th Circuit 205 and- 410- Pardon? 410 506. What's the name of the case? Skokomish. Spitkomish? Skokomish. It's Judge Whaley's state. If I'm mispronouncing it, I apologize, but- Skokomish. Skokomish. Okay, all right. What was that? I don't have the case in front of me. There's so many Indian names. It's Skokomish v. U.S. and it's a 2005 decision, Your Honor. And there was a concurrence in part and dissent in- 2005. Yes, concurrence in part and dissent in part- 10 years ago. Yes, sir. What were the facts? The facts had to do with, it was a nuisance case and the question was whether or not something was abatable. And there was discussion under Washington law because Washington law was what was applying. Washington law, and Judge Whaley will correct me if I'm wrong, but this is what the decision says. Washington law uses continuing nuisance as an exception to permanent nuisance. And that's what the difference between California and Washington law was. But in that, the question of abatability was really front and center. And in the part of the opinion that you then concurred in, it was a dissent in part and concurrence in part. And the part that I'm referring to now, that had your name on it as well, was the part that talked about- I concurred in that one. Did you say? It's a funny decision because I think it's an en banc panel and they were deciding how much of a hearing to give. And there was discussion about whether they were going to take it or not. And so there is an opinion and then there's a dissent and a concurrence. And you are on the dissent and concurrence. But the parts of the dissent- Where's his place? Pardon me? Where, what's the location? This is Cook Amish? Yeah. Judge Whaley might be able to tell me better. Well, how does Fletcher versus, how does, what is it, Ryan versus Fletcher work into this? I'm drawing a blank, Your Honor, I'm sorry. Fletcher versus Reynolds, remember that? I still am drawing a blank, I apologize. The classic tort case where you, on your land, you create a situation that flows into another person's land. You've never heard of that? I'm sure I know, I'm sure I know the case. Did you go to Berkeley? Did I go where? The Berkeley Law School. I did not go to Berkeley Law School, Your Honor. Perhaps I should have. But I've been practicing nuisance and trespass law and environmental law for many, many decades. And so I'm sure I know the case and it's just, it's not resonating with me right this instant. But the concept is that if you do allow material to flow onto your neighbor's property, you are trespassing and you also are creating a nuisance. I mean, that's... Read Fletcher versus Reynolds. Yeah, well, my partner's going to come up and kick me in the back in a moment and say what an idiot I am because I don't remember Fletcher's v. Reynolds right this second. But I... Where'd you go to law school? I went to Harvard, Your Honor. They teach you the law there, do they? You know, I grew up in Kansas and I probably learned more common sense in Kansas. They get on the Supreme Court and muck everything up. Or sludge everything up. Well, Your Honor. It's okay. Don't ask me to go there, okay? Oh, no, no. You don't have an expert on the loss of use damages? No, we did. Waters. The guy's name is actually Waters. Waters was his name. He was the Waters expert. He's the guy that gave the estimate on the estimated value of the loss of use for the groundwater resource. And then Randall Bell and Brown were the primary experts on the rental value, if that was the loss of use question. And there, you know, there it's just the... Again, the statute says reasonable... And then Forrester on the restoration? Pardon me? And then Forrester on your restoration damages? Correct. Yeah, Forrester was really the restoration person primarily. And so, you know, and the jury may decide that what Forrester says is not the reasonable cost of restoration. They may say that Kinder Morgan's done enough to restore to original condition. But I think that that's a jury question, not a judge question at this point. I have 60 seconds left and I have a lot of material to cover, but I'm going to... I would be respectful and if I can save... Time is flowing in to other property. Your Honor, it is. It is. Okay. But if there's other questions that I can... I would like to have a few minutes for rebuttal, if possible. We'll do that for you. Thank you, Your Honor. Okay. Good morning, Your Honors. All right. My name is Steve Strauss and with my partner, Ray Hartman, we represent Kinder Morgan. May it please the court. This is a case about Kinder Morgan meeting its statutory obligation to remediate this property at no expense to the city and with no loss of use to the city. The district court here properly granted summary judgment because the city's claim damages are speculative as a matter of law and damages are an essential element of every cause of action, every tort cause of action, and because the damages here, the fact of damage, was not proven with certainty. So that's why the summary judgment was granted in this case. Judge, when you asked some questions that went to the statute of limitations, but I just want to make that clear. The statute of limitations on the nuisance and trespass claims was an independent basis to grant the summary judgment. But the district court granted summary judgment on all of the tort claims because there were no damages as a matter of law. There wasn't evidence that wasn't speculative that could get to a jury. And anticipating, I think, what you want to hear. How could there be no damages as a matter of law? Isn't it a given here that this pollution is moved across boundaries? And it's underneath that Petco Stadium. No, Petco's downtown. It's under Qualcomm Stadium, Your Honor. Wherever it is, you know. Yeah. Well, doesn't it flow from those tanks? Down towards Petco? Yes, Your Honor. Let me address that. I knew that's what you wanted to hear. I think what you want to hear is about the cleanup in the site. So let me tell you. So this project is under one of the most extensive cleanup and abatement orders in the history of the state of California. The abatement order issued in 1992. So over 20 years ago. Kinder Morgan has been cleaning up the site since then. In 2010, Your Honor, all of the soil was cleaned up. And a no further action letter was received from the water board. And at the end of 2013, the groundwater was cleaned up. It's been monitored for four quarters since then. And we're awaiting the no further action letter there. So to put the court at rest, absolutely. There were discharges on this property. There were leases of petroleum that actually preceded Kinder Morgan's ownership. But for which it took responsibility back in the 80s. But by 1992, this water board order was in place. And the plaintiffs, and there has been no, and the claim here is a claim of continuing nuisance, right? And so for continuing nuisance, Your Honors, you have to focus on the statutory period. Otherwise, it's a permanent nuisance and it's time barred as the district court found. But the statutory period here, so I think to just try to zero in on your question a little bit, what we're looking at is 2004 to 2007. And there is no evidence in this record, Your Honor, from an expert or otherwise, that during that period of time, any petroleum releases went from the Kinder Morgan terminal to the city property. That's why there are no damages on the restoration, excuse me, on the abatement side. So Kinder Morgan has cleaned up the site and we're waiting for the final no action letter. The other category of damages that the city seeks here is loss of use damages. And as a matter of law, there are no loss of use because there wasn't any loss of use during this statutory period. Let me ask you something because I don't think we understand the record from the briefing as well as I should. I've had some experience with these kind of cases in Washington, but it was a lawyer a long time ago. I assume they're Monterton wells that were on the property, on the plaintiff's property. That's correct, Your Honor. And are you saying that if you went to a Monterton well during the statute of limitations period, that there may have been petroleum found remnants in the water, but you couldn't tell whether they had crossed in the statutory period or crossed before? Correct, Your Honor. Is that what you're saying? Exactly right. So what you're saying is that while there may be something there, the only thing that's actionable is if it came after 2004 and we don't have any evidence that what is there was from 2004 on. Am I right? Correct, Your Honor, for a continuing nuisance. Excuse me? Yes, Your Honor, for a continuing nuisance. That is the test and the standard. That is correct. Now, the other thing that I've struggled with, and maybe because the plaintiff did and you have, is I read this California statute that says you have to restore to original condition. And is what we have here that you think original condition has some other definition besides original condition? The word background is used, but I assume that means no petroleum. So you're saying it's a different definition? Or, because it seems like I wouldn't quarrel with their experts saying original condition is background unless there's a different definition. So I'm asking that. Are you saying that it made original condition here would not be background because there were other pollutants that had already migrated? Therefore, original condition would be something with pollutants in it. And because there was no study of what original condition would be, whether it would be background or have pollutants in it, that therefore the expert's opinion should be stricken. You see what I'm saying? They're two different things. I do, Your Honor, and you've packed a lot into that. So if I can try and answer your question directly. So let's start with the statute. I think that's where your question started, 3334. And 3334, the language that it uses, there's two parts to 3334. Restoration of the property to its original condition, and then you're entitled to that. You're also entitled to any loss of use. I've addressed loss of use for now. So let's focus on your question, which is restoration to the original condition first. It does not say background. And so what we have are cases interpreting that statute. And what the cases interpreting that statute have said, what the courts have said, is that restoration equals abatement. And abatement means that the property can be abated at a reasonable cost and by a reasonable means, and it's subject to the agency standard, the water board. And that's the Capo Giannis case, and also Mangini. There's no case that says under 3334 that you have to restore to background. Now, I agree with Your Honor that the writing of the statute, restoration of original condition, is trying to get the plaintiff back to the place before there was contamination, of course. And so that's where the city fails for several reasons here. Because first, if when we don't have evidence of that background or original condition here, Mr. Forster didn't attempt to study that. As Justice Wynne asked about background, what Mr. Forster did, and it's in his report, is he was instructed to assume that that was the standard. And what he said is that's the expectation of the landowner. Right? He said the expectation of the landowner is restore to background. And that was one of the methodological failings that the district court relied on in finding that it wasn't admissible under Daubert. The problem I had with that was I don't think an expert tells you what the law is. So I don't care what he thinks it is. It would be what does restoration to original condition mean, whether it's... And so his opinion on that wouldn't mean you wouldn't let him testify about physics or about hydrology, because his opinion about what original condition, restoration to original condition is irrelevant. I mean, the judge has to instruct the jury on that. I agree with you, Your Honor. And if he had... That's not a good basis. My point is to strike the opinion to say he had the wrong definition of restoration. No, the point I was trying to make there, Your Honor, is the city would be further along if the expert had actually studied that and had data rather than assumed it. But you're right. It's a question of law. And the subjective expectation of the landowner is not the standard. And what the courts have done is they've interpreted the standard. As I said, they've interpreted restoration to mean... Let me push you a minute. Assume that I was to buy that where he said there were other wells that did not have any original condition. Then you'd have the conflict. The judge would have to decide. No, original condition means whatever comes out of abatement. So we'd have to define original condition to include abatement and what you've told me. Or original condition would be if the jury so found the original condition was that there was no pollution. Here's the problem, Your Honor, with Mr. Forrester's opinion related to background in addition to what you've already heard and what you've asked me, is that there's really two parts of that opinion, right? First, you have to say what the standard is. He says background. I'll leave that alone for a minute. The second thing you have to do is you have to have an estimate of what it would cost to remediate to the level that you're proposing, right? That's what all the cases say. That's what Mangini says. That's what Beck says. That's what McCoy says. The problem here with Mr. Forrester, the other reason that his opinion completely fails and why you don't get to background is because the estimate that he had prepared was for a different technology than the technology he was recommending be used to remediate the site. So what you have in this record is two underpinnings of Mr. Forrester's opinion, both of which fail. First is background, and we submit to you that background, that original condition does not mean background per the cases. But secondly, there is no opinion. There's no evidence in the record of what it would cost to repair it, even if you want to go to background. We don't know what that would be, and that's a failure of proof. And it's the city's office. Wouldn't the original condition depend upon the property itself? Like, in other words, some property, the original condition may have been polluted. Correct. Okay. So if that's true, and then you have evidence in this record that the original condition was no pollutant, I'm calling that background. I might be wrong, but let's call it no pollutants. Well, that's the first part I disagree with you respectfully. Good, because I didn't say anybody defined background. I'm just, you kept using the word. But I assume as a layperson that background is, you know, water. And then what you have is water with oil in it. So assuming there's enough evidence in the record to show that original condition means no pollutant. So you're right, Your Honor. I think background here would mean no hydrocarbons in the soil or groundwater. But Mr. Forster didn't investigate that. That's the problem. He just assumed that the city had the right, because their expectation was it would get cleaned up to hydrocarbon-free, that he would give an opinion on that. But what he didn't tell us is whether there were pre-existing hydrocarbons in the water or soil. That wasn't in his report. And he tried to save it in his deposition by saying, well, I saw some evidence of areas of data that were hydrocarbon-free. But that, of course, wasn't sufficient to support an opinion that the background condition of this property was hydrocarbon-free. Let's assume that there are legitimate deficiencies in Mr. Forster's opinion because of the failure of investigation that we've been talking about. Why aren't those impeachment issues? Why exclude his opinion altogether? Well, I think, Your Honor, as you said, and as this court said in one of its most recent expressions under Daubert, in a state of bereavement, that the district court is charged explicitly with the gatekeeper role. And the district court judge has to determine if the testimony is reliable and relevant before it can go to the jury. And so this isn't an issue, or like City of Pomona, Your Honor, Judge Pragerson, which you wrote about, where what we're talking about is contested evidence, otherwise admissible. You have no proper opinion here. It's fundamentally unreliable. I think the judge here was very aware of his gatekeeper role, but it doesn't necessarily mean that you close the gate altogether. Correct, Your Honor. What I'm suggesting, though, is this isn't a case like a state of Barabin, where the expert had a methodology for the opinion, and it was contested, and you decided that could go to the jury. This doesn't cross the line. This doesn't meet the bar for reliability or relevance, because in this case, Mr. Forster both did not do any investigation or present any data of what background was, but secondly, equally important under the cases is his estimate was thrown out because it was for different technology. And that's fatal, because then this, because for it to be a continuing nuisance, the city has to prove that it's abatable at a reasonable cost. And we don't even get to the skomish issue that you were asking about, which is whether spending $180 million with what Kinder Morgan spent and what the city says would be reasonable for a property worth $100 million. We don't even get to that issue because of the failure of proof. The city has no estimate, none, of what it would cost to remediate this property to background because of what Mr. Forster did. He hires a consultant to estimate what it would cost to repair. He doesn't even tell the consultant, Teratherm, that he hires, that this is the city of San Diego, that it's the stadium property, doesn't tell him that. So they recommend a fix using steam that couldn't possibly work on this site. You couldn't subject people going into a stadium to steam. Mr. Forster recognizes that and withdraws the opinion. He says, you're right, this won't work. Then what he tries to do after his report and in a declaration following his deposition, he tries to save it by saying, well, steam, electric, it's like ice cream. They're both flavors of thermal. That doesn't work. The court found directly that there was no basis, absolutely no methodology, no basis for him to try and export the $120 million estimate for steam to electric. And that's why it fails under Daubert. And that's why it's different than the opinion we just talked about. It's not relevant. What's to prevent the city, now that you've pointed out all these problems, from going and finding and locating another expert to do a proper study? Well, I mean, here's a case where it's tossed out on summary judgment. You know, that's reclaimed water that you're drinking from our water treatment plant. I promise it's not San Diego Aquifer water, Your Honor. You like the taste. But we add certain special chemicals on flavors. So why throw a case out because of this importance? Because let's assume the city of San Diego got tied in with an expert who is somehow wanting. So, Your Honor, as a lawyer, we're bound by the rules. And so the city had the full opportunity to investigate and discover its case and present its experts. And all that was done. And the depositions were taken. And the case was ready to go to trial. And the motions were made. So I don't believe, Your Honor, the rules say you get a mulligan. You get to go back and get a new expert. But I think if, but in part to answer your question, or perhaps any unease that you may have or the panel may have, remember, this is a claim for a continuing nuisance. And the court found that that failed and that it was a permanent nuisance and time barred. But your argument would be left for another day. Kinder Morgan has abated this site, Your Honor. If I have that much time left, so it's. Last answer. I'm sorry, Your Honor, can I just finish the answer to that question? If there was a future discharge from the Kinder Morgan property to the city property, they would be able to assert a new claim. So I don't think there should be any unease among the panel in affirming what the district court did here. Again, the city has known of these claims since the 80s. Kinder Morgan's been subject to one of the most rigorous abatement orders in history. Yet the record said they'd spent $60 million because it hasn't been, you know, we haven't been able to update it since the briefing. Now it's more like $75 million. That's not a lot of money these days, is it? It seems like a lot of money to me, Your Honor. Well, I know to me too, but, you know, some places you just get a humble cottage for that. If there are any other questions from the panel, I would be happy to address them. And I hope I responded, Judge Whaley, to your questions on the nuisance side, which I know can be a bit confusing, but I would just like to end with where I started. Well, the thing I don't know is, and you may have answered it and it just went over my head, but if you look at original condition, it sounds like what you're saying, it doesn't really mean what it says. It means abatement. It does. So if the original condition was petroleum free, that you would not have to abate to petroleum free. You'd only have to abate to what some agency says that abatement means for the adjacent property. The caveat being, as Mr. Tatro mentioned, if it's not technically or economically feasible, then the agency standard is to clean up to the ACLs, which are the alternative cleanup levels. So if you were instructing a jury in this case, what would the jury instructions say about restore to original condition? It would say that it means what? It would say that restoration means abatement, and abatement means by a reasonable means at a reasonable cost, as the California Supreme Court said. To what level? Excuse me? To what level? To the agency level, as the court said in Capogiannis and Mangini. So that might be so many parts per billion of petroleum or whatever is okay, even though that's how the jury would be instructed, in your opinion, in a California law. Yes. But again, Your Honor, this never gets to the jury because of the failure of damages, which are fundamental. There are no damages that aren't speculative in this case. Is the Water Board order still outstanding? Is cleanup continuing, or has that, in Kinder Morgan's view, been completed? So as I mentioned before, and I apologize if I wasn't clear on that, so there's two parts to this, right? The soil and the groundwater. Kinder Morgan received in 2011 a no further action letter from the Water Board on the soil. The groundwater cleanup was completed on schedule at the end of December 2013, and then what the Water Board required was four additional quarters of monitoring data before they send out the no action letter, which is in process. The four additional monitoring periods have been completed. The groundwater has met the agency standard, and the no further action letter is expected to issue any time. Any further questions? All right. Thank you. Your Honor, my partner, who is a Berkeley grad, reminded me of the Rylands v. Fletcher case and kicked me. Don't worry about it. Your Honor, I think, Your Honors, I want to separate out the question of continuous nuisance from the question of- I don't even know that I'm right, but you know. You are correct. The question of continuing nuisance from the question of damages, and as Judge Pregerson and that's a commish decision, you noted there. Those are two separate questions. Even though they're related, they are separate, and I sit here and I listen to Mr. Strauss talk about we have abated, we have abated, we have abated. That is the first test for a continuing nuisance. Is it abatable at a reasonable cost and technologically feasible way? That's what the order said they had to do, and that's what they said they have done. But do you have a statute of limitations issue on the continuing nuisance if you don't have Forrester? No, because it's out of their mouths that it is a continuing nuisance. They've said we have abated, and the board ordered them to do it by technologically and economically feasible means, just like in FERC. And in Skokomish, again, Judge Pregerson, in the part that you were on, you said partial abatement, and you cited the Mangini case and other California cases that say partial abatement. If something is partially abatable, that's enough to have a continuing nuisance. So once we've got that continuing nuisance, we are into the damages realms, the different measures of damages. There are other tests for continuing nuisance. We meet those as well. Was it crossing the property line as of August 2004? And those are the sites of the record I recited earlier. Yes, it was, because they didn't put their containment system in place, and they say we didn't contain until June of 2005 or later. Well, saying you didn't contain doesn't tell you that it also got to the property next door. I mean, it could be the containment could have been 400 yards away from the property. I mean, it's just a conclusion. We didn't finish our abatement. But the question is, and I've been told there's no evidence that anything got there from 2004 to 2007 as opposed to came there earlier. Your Honor, I think if I'm listening as carefully to Mr. Strauss as I have listened over the years, what they were saying is there was not a release that took place after August of 2008 that got to the property after August of 2008. We don't need to answer that question. Look at the last comment to 2030, the jury instruction. That's not the issue. The issue is, was it continuing to cross the property line? Their people say, we didn't achieve containment until June of 2005. We have abated. So that's the second test. And the third test is this variability test. If it's variable, then it is, again, it's something that is continuing on. And what would you cite in the record if we were writing an opinion that says there was material discharged across this line on the dates in question? Because the district judge found there wasn't. What would we be supposed to say there was? And I even think Judge Noonan mentioned that that portion of Forrester's opinion was not, the striking of that, was not appealed. Your Honor, I think that there's a few things that you can cite. One is we have evidence which is, did it get from point A to point B at some point? The answer to that is yes. There's no dispute about that. We all know it got across. We know that these materials are mobile in the groundwater. That's at page 49 of their brief in this case. We know that they didn't build a system until June of 2005 and contained things. So at that point, and then I also go back, Your Honor, to the Half versus Lone Pine, where they were under an order since 1992 to stop that migration. And they controlled the consultants. They controlled the testing. And if there is a gap in the proof there about that continuing flow, and you can't draw that inference, then I think under Half versus Lone Pine, that burden should be shifted to them. So the last test for this is, did the impact vary? And there we've got the pictures of the footprint that show, from their consultants who will be on the witness stand, showing the impact varied. And then there's a 2005 report that they put in to the regional board that said, and it uses the term varying. It says the impact or the concentrations of these substances that we're finding on city properties varies by location and time. And they really don't have an explanation as to why it varies. So the variability part of continuing is met as well. Your Honor should ask about whether or not Forrester provided any information about data on background. And for that, there's a discussion at page 34 of our opening brief. But the sites there are ER 142 through 145 and 2620 through 21, where he does refer to the historical samples. He also, and this is a point that Mr. Strauss made that I want to make sure we emphasize, what Forrester says in his opinion, and this goes to the restoration cost, is he says that a thermal technology, such as steam, is the one that he originally discussed, would be the appropriate way to clean this up. He then, when he says, well, you know, I can understand why steam wouldn't work, but I stand by the thermal technology, which EHR is one, and the estimate for that is about the same. So the thesis don't say, to get to the jury, you have to put in an actual work plan with a bid from a contractor and blah, blah, blah. What they say is you got to give a reasonable estimate. Forrester did that. And so we do have information for an appropriate remediation technology. And when Mr. Strauss says, well, it's not ice cream, there is no evidence in the record to back that up. The evidence in the record is what Forrester, who is the expert, says. That's the evidence. Now, granted, it was excluded, but that's the evidence. The last point, unless the panel has additional questions that I would like to address, is this question of restoration to background and why we talk about restoration to background and whether the agency doesn't control whether or not something gets restored to background. Our agency, the regional board, has a particular charter. It can't award damages. It can't award relief to a property owner. And its charter is to do something to protect not the city of San Diego, not you or me or anyone else, but to protect the water. And so they're going to take steps that they think are adequate to protect the water. But if, like in the Campagenia's case, it may be fine to say, okay, I'm good with the level of abatability that the board said was right. That may be. But if you're on somebody else's property, then you, as the property owner, have the option of saying what you want. And that's what the statute says. The statute, it was passed in 1992 to disincentivize polluters. And it's been in front of the legislature multiple times since then. And they haven't once said what would have been an incredibly simple thing to say. By background, we mean all you have to do is meet a regulatory standard. That's what we mean. So it's restored background unless a regulatory agency says otherwise, in which case that controls. They've never said that. And the statute stands. And this is, you know, Judge Pragerson, I'm sorry to have quoted you so much today. But as you said in numerous cases, I think Leslie Salt, if I'm remembering, U.S. v. Humphreys, but you start with the plain language of the statute. And if it's plain, if it's clear, that's what you apply. That's the job of the courts. And our district judge rewrote that. He wrote it out of the statute. And that isn't his job. And as I said before, Your Honor, the jury may look at this and they may say, you know, foresters proposing for restoration costs, we don't agree that that's the right number. They could well do that. That's why we separate continuous from the question of damages. Anyway, I appreciate your indulging me additional time. If there's other questions, I'll do my best. The Salt case came out of San Francisco Bay, didn't it? The Leslie Salt case, correct, Your Honor. I think of that every time I fly out of San Francisco. You know, I just saw a thing on the, it was like the 20 best views of interesting things in the world. And they have the salt ponds on there because of all the different colors and the changing that they deal with. It's changed. I don't see it anymore. You know, I... Well, but I fly out of Oakland now. Yeah, and I fly mostly from Portland. And so we come down and don't fly over. So... So what you're saying that there's disputed factual issues here and the matter ought to be decided by a jury. Your Honor, on the question of continuous, there's really... I mean, I would go with a disputed factual issue, but their admissions, I think, put the issue to bed. And then on the... Because we got hit with that on 56F. I mean, that was... They moved after we had moved for summer judgment. But then on the damages issues, yes, clearly there are issues, disputed issues that should have been decided by the juror. All right, any further questions? I don't have anything. Thank you. Thank you for the additional time. That concludes this session of the court and we'll resume.
judges: Whaley, Pregerson, Nguyen